1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DAVID DANIELS,

11          Plaintiff,              No. CIV S-03-0400 MCE GGH P

12      vs.

13   W. YOUNT, et al.,

14          Defendants.           FINDINGS AND RECOMMENDATIONS

15   _____/

16   Introduction

17          Plaintiff, a former[1] state prisoner proceeding pro se, seeks relief pursuant to 42

18   U.S.C. § 1983.  Pending before the court is defendants' motion for summary judgment, filed on

19   March 20, 2006, to which plaintiff filed an opposition.

20   Plaintiff's Allegations

21          As previously set forth by this court,[2] with any subsequent modification noted

22   herein, this action proceeds on the second amended complaint (SAC), filed on May 21, 2003, as

23

24   ──────────────

25          [1] Plaintiff's latest change of address indicates that he has been released on parole.

26          [2] See, (Order &) Findings and Recommendations, filed on June 20, 2005, adopted by
     Order, filed on August 18, 2005, pp. 1-3.

                                  1

1 | modified by orders filed on November 13, 2003, August 10, 2004, and October 12, 2004.[3]  Thus,

2 | defendants remaining, employees at California State Prison (CSP) - Solano, are Yount, Ciraulo,

3 | Sandy, Mancill, Jackson, G.A. Smith,[4] K. Smith, Abella, Williams, and in the case of defendant

4 | Obedoza, the only claim remaining is that plaintiff received inadequate medical care from

5 | defendant Obedoza because he failed to assure that plaintiff received prescribed pain medication

6 | following the March 2, 2003, incident.

7 |           Plaintiff alleges that on November 26, 2002, in retaliation for plaintiff's past

8 | misbehavior, defendant Correctional Officer (C/O) W. Yount subjected him to cruel and unusual

9 | punishment and failed to protect him from physical abuse when he handcuffed plaintiff's hands

10 | behind his back and used force to hold plaintiff with a "stiff-arm[ed] grip" at another inmate's

11 | cell door to allow the inmate to throw urine on him.  SAC, p. 5.  While plaintiff was being

12 | exposed to the unnamed inmate's "dangerous bodily fluids," defendant Yount used physical

13 | force to hold plaintiff, causing plaintiff to lose his balance.  SAC, pp. 5-6.  Defendant C/O J.

14 | Ciraulo stood by silently during the violent assault, failing to take reasonable steps to protect

15 | plaintiff, demonstrating deliberate indifference to his safety.  SAC, p. 6.

16 |

17 | _____

[3]  The California Department of Corrections was dismissed as a defendant by Order, filed on November 13, 2003, adopting the August 22, 2003, Findings and Recommendations. Correctional Officer Bean was dismissed from this action without prejudice by Order, filed on

18 | August 10, 2004, adopting Findings and Recommendations, filed on April 26, 2004.  Defendants Prim(m), Freitas, Lamoreaux, Norris, Evans, Romero, Harmer, Brown, Carey and Alameida were

19 | dismissed, as well as all claims against defendant Obedoza with the exception of the specific inadequate medical care claim regarding plaintiff's not receiving prescribed pain medication after

20 | the March 2, 2003 incident, by Order filed on October 12, 2004, adopting the Findings and Recommendations, filed on August 18, 2004.

21 |

22 |           [4] Defendants alternate between identifying this defendant as either "C. Smith" or "G. Smith."  In the answer, this defendant is "G. Smith"; in their motion for summary judgment, he is

23 | "[Correctional] Smith," and, occasionally, "G. Smith" or "C. Smith."  Plaintiff refers to him, generally, as "C.A. Smith."  This inconsistency is not helpful, particularly in that there are two

24 | defendants in this action named "Smith," the other being C/O "K. Smith."  The court's review of the exhibits submitted by defendants shows that defendants' Exh. L, the C-1 Supplement to the March 2. 2003, Crime/Incident Report, is signed by Corr. "Sgt. G.A. Smith" and he also therein

25 | identifies himself as "Greg A. Smith."  Therefore, the court will refer to this defendant as "G. Smith" or "G.A. Smith," as there does not appear to be any defendant named "C. Smith" or

26 | "C.A. Smith."

1    On March 2, 2003, defendant E. Sandy used excessive force on plaintiff when

2  plaintiff became "allegedly" disruptive in the law library.  SAC, p. 9.  On the basis of a "minor

3  rule infraction," defendant Sandy ordered defendant D. Mancill to use force to remove plaintiff's

4  tennis shoes, shoes for which a doctor had issued a medical chrono for plaintiff.  Id.  Defendant

5  Sandy used the rule infraction as a pretext for inflicting physical punishment on plaintiff when

6  he, along with defendants C/Os L. Abella, K. Smith, A.R. Jackson, T. Williams, and C/Sgt. G.

7  Smith, used their hands to push, pull, grab and throw plaintiff into a steel holding cage the size of

8  a phone booth in such a manner as to deliberately cause plaintiff harm.  SAC, p. 10.  Their

9  actions in throwing or forcing plaintiff into the metal cage caused plaintiff to sustain a three-inch

10  laceration to his head, requiring 11 stitches.  SAC, pp. 10-11.  Defendants Sandy, Abella, K.

11  Smith, A.R. Jackson, G. Smith and T. Williams observed plaintiff bleeding from a head injury,

12  but left him bleeding in the cage for 45 minutes to an hour.  SAC, pp. 11-12.  Instead of making

13  sure plaintiff received emergency medical care, these defendants "made every effort to sanitize

14  the incident," while plaintiff was suffering in the cage.  SAC, p. 12.

15    Defendant Obedoza provided inadequate medical care because after prescribing

16  pain medication for plaintiff, he failed to assure that plaintiff received it.  SAC, p. 14.

17    Plaintiff seeks money damages.[5]

18  Motion for Summary Judgment

19    Defendants move for summary judgment on the following grounds: 1) defendants

20  are entitled to summary judgment as a matter of law based on the undisputed facts; 2) defendants

21  Yount and Ciraulo are entitled to summary judgment because plaintiff did not suffer a cognizable

22  injury; 3) defendants Sandy, Mancill, Jackson, G. Smith, K. Smith, Abella and Williams are

23  entitled to summary judgment because the facts show that defendants only applied the minimal

24  force necessary to restore discipline; and 4) defendants Sandy, Mancill, Jackson, G. Smith, K.

25

26    [5] Plaintiff's claims for injunctive relief were dismissed as moot by Order, filed on August 18, 2005.

1  Smith, Abella and Williams are entitled to qualified immunity from plaintiff's claims that they

2  used excessive force because they could have reasonably believed their conduct was lawful.

3  Motion for Summary Judgment (MSJ), pp. 8-18.

4  *Legal Standard for Summary Judgment*

5  Summary judgment is appropriate when it is demonstrated that the standard set

6  forth in Fed. R. Civ. P. 56(c) is met.  "The judgment sought shall be rendered forthwith if . . .

7  there is no genuine issue as to any material fact, and . . .  the moving party is entitled to judgment

8  as a matter of law." Fed. R. Civ. P. 56(c).

9  Under summary judgment practice, the moving party

10  always bears the initial responsibility of informing the district court
   of the basis for its motion, and identifying those portions of "the

11  pleadings, depositions, answers to interrogatories, and admissions
   on file, together with the affidavits, if any," which it believes

12  demonstrate the absence of a genuine issue of material fact.

13  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).  "[W]here the

14  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

15  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

16  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

17  after adequate time for discovery and upon motion, against a party who fails to make a showing

18  sufficient to establish the existence of an element essential to that party's case, and on which that

19  party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.  "[A] complete

20  failure of proof concerning an essential element of the nonmoving party's case necessarily

21  renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be

22  granted, "so long as whatever is before the district court demonstrates that the standard for entry

23  of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at 2553.

24  If the moving party meets its initial responsibility, the burden then shifts to the

25  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

26  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

(1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

        In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

        In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255, 106 S. Ct. at 2513.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

1   party "must do more than simply show that there is some metaphysical doubt as to the material

2   facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

3   nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct.

4   1356 (citation omitted).

5           On September 29, 2003, the court advised plaintiff of the requirements for

6   opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v.

7   Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc),  cert. denied, 527 U.S. 1035 (1999), and

8   Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

9                             *Undisputed Facts*

10          The facts set forth with reference to plaintiff's criminal background and

11  disciplinary history are undisputed.  As to any facts directly related to the incidents at issue,

12  whether disputed or undisputed, they are set forth under the names of the defendants against

13  whom plaintiff's allegations are relevant.

14          On October 31, 2001, plaintiff was sentenced to a seven-year state prison term

15  following conviction on two counts of vehicle theft with prior convictions.  Defendants'

16  Undisputed Fact (DUF) # 1, Exhibit (Ex.) A, Declaration  (Dec.) of Custodian of Records &

17  attached Central File Records, pp. 1-2.  On or about Nov. 8, 2001, plaintiff was placed in the

18  custody of the California Department of Corrections and Rehabilitation (CDCR) at North Kern

19  State Prison (NKSP).  DUF # 2, Ex. A, p. 7.  On or about Jan. 17, 2002, plaintiff was transferred

20  from NKSP to California State Prison(CSP)-Solano.  DUF # 3, Ex. A, p. 6.

21          Plaintiff was issued a Rules Violation Report (RVR) (CDC 115), on or about June

22  2, 2002, for battery on a peace officer for having become argumentative when directed to exit his

23  cell, then for rushing to the back of the cell, grabbing two four-gallon bags of inmate

24  manufactured alcohol and swinging the bags at C/Os Marshall and Rudi (not defendants herein).

25  DUF # 4, Ex. A, pp. 11-25.  On or about Sept. 24, 2002, plaintiff was issued a CDC 115 RVR for

26  refusing a direct order for not returning a pen when directed to do so by correctional staff.  DUF

1  # 5, Ex. A, pp. 26-29.  On or around Oct. 8, 2002, plaintiff was issued a CDC 115 RVR for

2  disobeying orders when he refused to accept a cellmate.  DUF # 6, Ex. A, pp. 30-32.

3                    *Defendants Yount and Ciraulo*

4                         *Undisputed Facts*

5              On or about Nov. 23, 2002, plaintiff received a CDC 115 RVR for flooding his

6  cell and impeding an officer from the performance of his duties; plaintiff flooded his cell;

7  defendant Yount responded, shut off the water to plaintiff's cell, and cleaned up the water, which

8  took about forty minutes.  Plaintiff admitted that he told defendant Yount that he would flood the

9  cell again the next time Yount worked on the tier.  DUF # 7, Ex. A, pp. 33-36; Ex. B, plaintiff's

10  deposition (dep.), 22:13-25:21; 34:1-13; 35:14-17.  While this is all undisputed, plaintiff casts a

11  slightly different light in a portion of his deposition as to how the warning that he would flood

12  the tier again came up, stating that it was in the context of getting into a verbal confrontation

13  with defendant Yount when Yount came to clean up the tier.  Because defendant Yount did not

14  like having to clean up, plaintiff testifies that he threatened plaintiff with some form of

15  retaliation[6] for flooding the tier, in response to which plaintiff said he would flood the tier again.

16  Ex. B, plaintiff's dep., 23:25-24:15; 35:20-25; 36:1-8.  On or about Nov. 26, 2002, plaintiff was

17  issued a CDC 115 RVR, for flooding his cell and impeding an officer from performing his duties.

18  Defendant Ciraulo responded; (non-defendant) C/O Freitas shut off the water to plaintiff's cell

19  and cleaned it up, which took about forty-five minutes.  DUF # 8, Ex. A, pp. 37-40.  The court

20  also notes that while defendants for some reason do not set it forth as an undisputed fact, plaintiff

21  admits to having flooded the tier again the day after the Nov. 23rd flooding, on Nov. 24, 2002,

22

23              [6] The court observes that plaintiff does not make a claim of retaliation in the
   constitutional context (i.e., as a violation of his First Amendment rights) in framing his claim
24  against defendant Yount, which would be a most frivolous allegation in that, in order to do so, as
   a threshold matter, plaintiff would have to allege that he suffered retaliation for the exercise of a
25  constitutionally protected right, Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995); Schroeder v.
   McDonald, 55 F.3d 454, 461 (9th Cir. 1995); Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir.
26  1985).  It is abundantly evident that engaging in such misconduct as cell or tier flooding under
   the circumstances set forth here could by no means be construed as protected conduct.

1   and defendant Ciraulo noted, in the RVR of Nov. 26, 2002, that plaintiff had previously flooded

2   the tiers on both Nov. 23, 2002, and Nov. 24, 2002.  Ex. A, p. 37; Ex. B, plaintiff's dep., 22:10-

3   23:24.  The court observes too that the Nov. 26, 2002, tier-flooding incident occurred after the

4   "gassing" plaintiff complains occurred on this day.  See, Ex. A, p. 37.

5           On Nov. 26, 2002, while plaintiff was housed in Administrative Segregation

6   (Ad Seg) in Building 10, defendant Yount at about 1530 hours (3:30 p.m.),[7] placed plaintiff in

7   restraints to escort him to the shower.  DUF # 16, Ex. C, defendant Yount's Dec., ¶¶ 3, 5-6.

8   While escorting plaintiff to the showers, defendant Yount placed his right hand on plaintiff's left

9   bicep; Yount and plaintiff were separated by approximately 12 inches.  The shower area was

10  located between cells 10-241 and 10-242; the approximate distance between plaintiff's cell, cell

11  10-204, and the showers was about 225 feet.  DUF # 17, Yount's Dec., Ex. C, ¶ 7.  Defendant

12  Yount placed plaintiff in the shower and went back to his duties.  DUF # 18, Ex. C, ¶ 8.  Once

13  plaintiff was placed in the showers, defendant Yount heard him calling for the sergeant, claiming

14  to have been "gassed," the term used by inmates to describe the throwing of urine and/or feces at

15  other inmates or staff.  DUF # 19, Ex. C, ¶ 11.  C/O Walker (not a defendant), who was working

16  as the control booth officer that day, did not observe plaintiff or Yount being gassed by an inmate

17  during the escort from the cell to the showers; nor was there any evidence of gassing having

18  occurred on the tier.  DUF #'s 21, 23, Ex. C, ¶ 12; Ex. D, Walker Dec., ¶¶ 4,[8] 7-8.

19  \\\\\

20  _____

21      [7] Although defendants assert in DUF # 16, that defendant Yount placed plaintiff in
    restraints to escort him to the shower at about 1515 hours, in his declaration relied on for that
22  information, defendant Yount states that he approached plaintiff's cell to escort him to the
    showers at approximately 1530 hours.  Moreover, the court adds ¶ 6 from defendant Yount's
23  Dec. as relied on to support DUF # 16 because Yount refers to placing restraints on plaintiff in
    that paragraph.
24
        [8] The court will continue to modify the paragraph numbers cited in declarations submitted
25  by defendants in support of their motion, by adding the correct paragraph numbers and/or
    deleting the incorrect ones in support of any DUF, without further reference thereto, so long as
26  the DUF set forth is supported by the declaration cited.

At about 1530 hours (3:30 p.m.),[9] defendant Corr. Sgt. Ciraulo heard plaintiff calling out to speak with him, after which Ciraulo told plaintiff that he would speak with him once plaintiff had finished showering.  Plaintiff was afterward escorted from the shower to the sergeant's office in the Ad Seg unit by C/O Freitas (not a defendant).  DUF # 24, Ex. F, defendant Ciraulo's Dec., ¶¶ 4-5.  Plaintiff stated that he had had urine thrown on him by an inmate in cell 10-217, while being escorted to the shower, that he had not showered in order to "leave the evidence on him"; that defendant Yount and (former defendant) Primm had witnessed the incident and failed to do anything to protect him, that he wanted to be seen by medical staff.  DUF # 25, Ex. F, ¶ 6.  Defendant Ciraulo told plaintiff that his first priority was to have plaintiff be seen by medical staff and that afterward he would further discuss the matter with plaintiff; defendant Ciraulo told C/O Freitas to get plaintiff, dressed only in boxer shorts and shoes, a jumpsuit and to escort him to the clinic.  DUF # 26, Ex F, ¶¶ 7-8.  In response, plaintiff yelled: "You're in cahoots with them, you're violating my civil rights, you son of a bitch, you mother fucker.  I'm going to nut up on your asses.  I'm not putting on no jumpsuit.  Fuck you.  Fuck all of you."  While he yelled incoherently in the direction of Ciraulo and Freitas, plaintiff stood up and kicked the chair he had been sitting on; plaintiff admits he was frustrated and confrontational and that he kicked a trash can.  DUF # 27, Ex. F ¶ 9; Ex. B, plaintiff's dep., 52:7-23.  Defendant Sgt. Ciraulo and C/O Freitas took positions on either side of plaintiff and escorted him to a holding cell to prevent him from harming himself or others.  DUF # 28, Ex. F, ¶ 10.  Defendant Ciraulo contacted the on-duty Building 10 medical staff and asked that plaintiff be examined

_____

[9] The court observes that, with the correction to the approximate time that defendant Yount states in his declaration that he placed plaintiff in restraints for the shower escort, and the approximate time that defendant Ciraulo states that he heard plaintiff calling out to him from the shower area, there is no lapse of time, which is perhaps why in DUF # 16, the time was modified to be 15 minutes earlier.  While the discrepancy is minor, a particular fact cannot be modified even if erroneous, without specific evidentiary support for doing so; in any event, as the times are stated to be approximate, this inconsistency is deemed to be insignificant.  (Plaintiff, who also appears to be estimating, places the time of defendant Yount's having approached him to see if plaintiff wanted to go shower as being "after 2:00 [p.m.[, but probably before 3:00 [p.m.]" Plaintiff's dep., p. 37.)

1  immediately.  DUF # 29, Ex. F, ¶ 11.  Psychiatric Technician (PT) Norris (previously dismissed

2  as a defendant) examined plaintiff and filled out a CDC 7219 Report of Injury or Unusual

3  Occurrence.  DUF # 30, Ex. F, ¶ 12, Ex. G, Report of Injury or Unusual Occurrence.  There was

4  no evidence of any liquid substance having been thrown on plaintiff; neither his body or his

5  boxers were wet or stained, nor was there any urine order detected.  Plaintiff did not complain of

6  any fluids thrown in his eyes, nose or mouth.  According to defendant Ciraulo, PT Norris did not

7  see any open wounds and determined that plaintiff suffered no apparent injuries arising from the

8  incident.   Plaintiff was referred back to custody without incident.  DUF # 31, Ex. F, ¶ 14; Ex. G.

9  Plaintiff admitted that urine did not get into his eyes and that he had no open wounds or

10  abrasions at the time of the claimed incident; plaintiff also concedes that he did not suffer any

11  injury from the incident and that he did not seek follow-up treatment.  DUF # 32, Ex. B,

12  plaintiff's dep., 44:1-6; 53:15-23; 55:12-18.  Following the examination by medical staff,

13  plaintiff was taken to the shower, provided the opportunity to shower and ultimately was returned

14  to his cell.  DUF # 33, Ex. F, ¶ 13.

15                                    *Disputed Facts*

16           As to defendant Yount, plaintiff takes issue with several purportedly undisputed

17  facts.   In DUF # 20, defendant Yount sets forth that he did not observe another inmate throw

18  urine on or at or in the direction of plaintiff during his escort to the shower and, given the

19  proximity of defendant Yount to plaintiff, Yount would have been gassed as well during the

20  escort, which he was not.  DUF # 20, Ex. C, ¶¶ 9-10.  Plaintiff does not dispute that defendant

21  Yount escorted him to the shower area on Nov. 26, 2002, nor does he maintain that defendant

22  Yount himself was gassed, but he does argue that he was set up by defendant Yount, whom he

23  contends had unlocked the food port of another Ad Seg inmate's cell prior to escorting plaintiff

24  and then held plaintiff in front of the inmate's cell as the inmate threw urine on plaintiff in

25  retribution for plaintiff's having flooded the tier on a prior day (or days), making unnecessary

26  work for defendant Yount.  Opp., pp. 16-19.  In support of this argument, plaintiff submits as Ex.

A, a copy of a CDC-115 RVR, signed by defendant Yount and dated Nov. 23, 2002 (also

submitted by defendants), describing plaintiff's tier-flooding on that day.  Plaintiff also submits a

sworn declaration from another inmate, Jerry Dean Savage, then located in cell 10-140-L, that he

(Savage), on the day at issue, saw plaintiff proceeding toward cell 10-217, and that the relevant

area was well-illuminated.  Ex. B, Savage Dec., to Opp.  Savage maintains that he saw the

occupant of cell 10-217 open his tray slot and toss an unidentified substance at plaintiff, while

defendant Yount appeared to the observer to be holding plaintiff directly in the "line of fire."  Id.

Plaintiff also submits a copy of a Medical Report of Injury or Unusual Occurrence that was in

addition and subsequent to the one identified by defendants, dated Nov. 27, 2002, wherein the

R.N. filling out the report at 0045 (12:45 a.m.), quotes plaintiff as stating: "Today, C/O Yount

while escorting me to the shower – he held me by the inmate cell - 10-217- and let the inmate

assault me and he is Southern Mexican."  Ex. C to Opp.  Plaintiff apparently went on to describe

to the nurse that the fluid thrown at him as being yellow and smelling like urine.  Id.  Within his

deposition, plaintiff identified the inmate who allegedly threw the urine at him as having a "tatoo

of a 13"on his face, which plaintiff testified indicated that he was a Southern Mexican

gangmember, and that although plaintiff claimed not to be a member of any gang, his being an

African-American made them rivals simply because of the racial divide in prison.  Plaintiff's

dep., p. 40.

        In another portion of plaintiff's deposition not submitted as defendants' Ex. B (the

portion of plaintiff's dep. submitted in support of defendants' motion), plaintiff states:

> So what Officer Yount had did [sic] was in order for him to
> retaliate for me flooding the tiers was he set it up by unlocking cell
> 217 food port.  Then he came to get me to take a shower,
> handcuffed me and grabbed me in an escort position with one hand
> and escorted me to cell 217 and allowed cell 217 to assault me by
> throwing urine on me.  And he held me in that position.
>
> When I tried to avoid the assault from cell 217 Officer Yount used
> force to hold me and allowed me to be assaulted and wouldn't
> allow me to avoid the attack.

11

1    Plaintiff's dep., 37:3-12.

2           Plaintiff also disputes defendants' DUF # 22, wherein C/O Primm (dismissed as a

3    defendant), the other floor officer that day (besides Yount), declares that he did not see any

4    gassing motion, Ex. E, Primm Dec., ¶¶ 4, 6-8, defendants themselves noting that, at DUF # 25,

5    plaintiff informed defendant Ciraulo that Primm had observed the incident and done nothing.

6    Plaintiff, however, does not submit evidence to counter Primm's declaration.

7           As to defendant Ciraulo, plaintiff in his opposition, states that defendant Ciraulo's

8    indifference to plaintiff's report of defendant Yount's "brutal behavior" is evidenced by the fact

9    of Ciraulo's having failed to take action in response to plaintiff's allegations, pointing instead to

10   this defendant's having documented a CDC 115 RVR, five hours later on Nov. 26, 2002, for

11   plaintiff's having flooded the tier on the same day.  Opp., p. 24 & Ex. D.

12                                   _Eighth Amendment_

13          The Eighth Amendment prohibits punishment of those convicted of crimes by

14   methods which contravene society's "evolving standards of decency."  Rhodes v. Chapman, 452

15   U.S. 337, 346, 101 S. Ct. 2392, 2399 (1981).  The deprivation alleged must implicate "the

16   minimal civilized measure of life's necessities."  Rhodes, supra, at 347, 101 S. Ct. at 2399.  The

17   Eighth Amendment is concerned with "deprivations of essential food, medical care, or

18   sanitation" or "other conditions intolerable for prison confinement."  Id., at 348, 101 S. Ct. at

19   2400.  "Among 'unnecessary and wanton' inflictions of pain are those that are "totally without

20   penological justification."  Id., at 346, 101 S. Ct. at 2399, citing Gregg v. Georgia, 428 U.S. 153,

21   183, 96 S. Ct. 2909, 2929 (1976).

22          "[W]henever prison officials stand accused of using excessive physical force in

23   violation of the [Eighth Amendment], the core judicial inquiry is...whether force was applied in a

24   good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."

25   Hudson v. McMillian, 503 U.S. 1, 6-7,112 S. Ct. 995, 999 (1992).  When determining whether

26   the force was excessive, we look to the "extent of the injury..., the need for application of force,

the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" Id., at 7.  In any event, as noted in Hudson, supra, at 9, 112 S. Ct. at 1000, citing Whitley v. Albers, 475 U.S. 312, 327, 106 S. Ct. 1078, 1088 (1986): "[w]hen prison officials maliciously and sadistically use force to cause harm contemporary standards of decency are violated.  See Whitley, supra [].  This is true whether or not significant injury is evident."  See also, Olivar v. Keller, 289 F.3d 623, 628 (9th Cir. 2002), noting Justice Blackman's concurring opinion in Hudson, supra, at 17, 112 S. Ct. at 1004, with regard to excessive force claims: "I have no doubt that to read a 'physical pain' or 'physical injury' requirement into the Eighth Amendment would be no less pernicious and without foundation than the 'significant injury' requirement we reject today."

### *Discussion*

Defendants' argument that as to defendants Yount and Ciraulo plaintiff must show that he sustained an objectively serious deprivation or injury, citing, inter alia, Hudson v. McMillian, 503 U.S. at 9, [112 S. Ct. at 1000], that argument is not persuasive as applied to the alleged actions of defendant Yount.  While plaintiff never denies that he flooded the tiers once, if not twice, and likely even with the intent of provoking a response from defendant Yount, he has raised a genuine issue of material fact as to whether or not defendant Yount subjected him to being doused with another inmate's urine.   Such a malicious or sadistic act, if proved, is enough "to cause harm contemporary standards of decency are violated, regardless of whether plaintiff was caused any significant injury, which plaintiff has not shown.  See Whitley, supra []"; see also, Olivar v. Keller, 289 F.3d 623, 628 (9th Cir. 2002), noting Justice Blackman's concurring opinion in Hudson, supra, at 17, 112 S. Ct. at 1004, set forth immediately above, with regard to excessive force claims.  As to the alleged conduct of defendant Yount, defendants motion for summary judgment should be denied.

\\\\\

1    However, with respect to defendant Ciraulo, plaintiff does not adequately oppose

2    defendants' evidence so as to raise a genuine issue of material fact.  That defendant Ciraulo

3    wrote a rules violation report noting plaintiff's misconduct in flooding the tier again later on the

4    same day as the incident at issue, observing therein that plaintiff had received two other recent

5    RVRs for similar disruptive actions and that the flooding caused officers to be deterred from

6    their assigned duties for 45 minutes, as plaintiff argues, (Opp., p. 24), simply does not

7    demonstrate that defendant Ciraulo had anything to do with the alleged conduct of defendant

8    Yount.  Plaintiff, in the face of defendants' evidence in support of their motion, simply does not

9    sufficiently overcome it to support the allegation of his second amended complaint that Ciraulo

10   stood silently by and did nothing to stop the alleged assault on plaintiff or to assist him

11   afterwards.  Defendants' motion for summary judgment as to defendant Ciraulo should be

12   granted.

13                  *Defendants Sandy, Mancill, Jackson, G. Smith, K. Smith, Abella and Williams*

14                                     *Undisputed Facts*

15   Plaintiff was housed in the Ad Seg unit of Building 10 in March of 2003.  DUF #

16   34, Ex. H, March 2, 2003, Part C-1 Supplement, Crime/Incident Report.[10]  On March 2, 2003,

17   C/O Theriault (not a defendant) told defendant C/O Mancill that C/O Bone (not a defendant)

18   needed assistance with a disruptive inmate in the library.  Defendant Mancill went to the library

19   and noticed plaintiff yelling at C/O Bone and disrupting the library environment.  Defendant

20   Mancill ordered plaintiff to quiet down and submit to an unclothed body search before he could

21   escort him back to his Ad Seg cell, whereupon plaintiff refused to cooperate with the search,

22   stating "No, I ain't stripping out."  DUF # 35, Ex. A, pp. 114-184; Ex. H; Ex. I, defendant

23   Sandy's Dec., ¶ 4.  Defendant Mancill eventually succeeded in persuading plaintiff to comply

24

25          [10] Defendants posit, as part of plaintiff's rather extensive disciplinary history, the
following as an undisputed fact, which occurred a little more than a month before the incident at
issue, on March 2, 2003, that, on or about Jan. 26, 2003, plaintiff was issued a CDC-115 RVR

26   for refusing to accept a cellmate, stating, "I'm not going to hell."  DUF # 9, Ex. A, pp. 41-46.

1   and Mancill placed plaintiff in mechanical restraints for escort back to his unit.  DUF # 36, Ex.

2   H.

3              Plaintiff was wearing personal tennis shoes, which are unauthorized for inmates

4   housed in Ad Seg.  DUF # 37, Ex. I, ¶ 5.  As plaintiff was being escorted back, defendant Sandy

5   informed plaintiff that plaintiff would have to relinquish his tennis shoes to defendant Mancill.

6   DUF # 38, Ex. H; Ex. I, ¶ 5.  Plaintiff admittedly refused to give up his shoes, becoming

7   argumentative with defendants Sandy and Mancill; plaintiff raised his voice, stating: "You'll

8   have to take them!  I'm not giving 'em to you!  You'll have to take them from the Southerners

9   and Border Brothers, then you come and get mine!  You'll have to fight me to get 'em!  I like to

10  fight!"  DUF # 39, Ex. B, 63:22-64:4; 65:18-25; 66:2-11; 68:5-24; 69:15-19; Ex. H; Ex. I, ¶ 5.

11             Defendant Sandy told Ad Seg defendant Sgt. G. Smith that plaintiff was being

12  escorted back to Ad Seg because he had been disruptive in the library; Sandy also advised G.

13  Smith about her orders that plaintiff give up his tennis shoes and about plaintiff's response.  DUF

14  # 41, Ex. I, ¶ 6.  Defendant Mancill counseled plaintiff, requesting his cooperation, to which

15  plaintiff replied: "I ain't giving you my shoes, man."  When, after entering Building 10,

16  defendant Mancill told plaintiff he would be escorted to the sergeant's office to resolve the shoe

17  issue, plaintiff responded: "No, I'm going back to my house."  DUF # 42, Ex. H; Ex. B, 60:1-7 &

18  70:4-7.  The court observes that that is what Mancill said plaintiff said; plaintiff says he told

19  Mancill that he did not want to go to the holding cell in the deposition portions quoted by

20  defendants, however, this is not significant enough to constitute a dispute on this point.

21             Plaintiff turned his body immediately in the direction of his cell, attempting to

22  pull away from defendant Mancill; as a result, Mancill was forced to tighten his grip on

23  plaintiff's arm and pull him in the opposite direction towards the sergeant's office.  When

24  defendant Mancill told plaintiff to stop pulling him, plaintiff's resistance diminished to the point

25  that his escort to the sergeant's office was completed.  DUF # 43, Ex. H.  Defendant G. Smith

26  was not in his office when defendant Mancill arrived with plaintiff, whereupon Mancill gave

15

1  plaintiff a direct order to surrender his shoes, to which plaintiff responded, saying: "I'm not

2  giving you my shoes, [y]ou'll have to take 'em!"   DUF # 44, Ex. H.

3          Defendant Mancill asked for assistance from staff and defendants Abella and

4  Williams unsuccessfully attempted to verbally counsel plaintiff to cooperate and enter the

5  holding cell; plaintiff remained argumentative and resistive.  Defendant Mancill tried to escort

6  plaintiff to a holding cell but plaintiff replied: "You can't make me go in no holding cage."  At

7  that point, the control booth officer notified the sergeant on duty, who arrived shortly thereafter.

8  DUF # 45, Ex. H; Ex. J, defendant Abella's Dec., ¶ 4; Exh. K, defendant Williams Dec.; Ex. L,

9  Crime/Incident Report, dated 3/2/03, defendant G. Smith supplement.  Plaintiff's demeanor was

10 very agitated, aggressive, and argumentative, and he admits that the incident was highly charged.

11 DUF # 46,  Ex. J, ¶ 5, Ex. B, 75:3.  Defendants Abella and Williams tried to counsel plaintiff

12 verbally to cooperate and to enter the holding cell to await the arrival of the Ad Seg unit sergeant.

13 Plaintiff continued to resist and to be argumentative.  DUF # 47, Ex. K, ¶ 4.

14         Defendants Abella and Mancill pulled plaintiff toward the holding cell, but

15 plaintiff resisted by swinging his upper body from side to side, planting his feet down in front

16 and leaning backwards.  Plaintiff attempted to put his right foot up against the metal locker to

17 prevent the escort.  At one point, plaintiff jerked his arm away and stated that defendant Abella

18 could not make him go into the holding cage.  Upon arriving at the holding cell, plaintiff placed

19 his right foot against the back wall of the holding cell to stop from going into the cell.  Due to

20 plaintiff's resistance and the added traction from his shoes, defendant Abella informed plaintiff

21 that they were going to have to take him to the ground if he continued to resist.  DUF # 48, Ex.

22 H; Ex. J, ¶ 6; Ex. K, ¶ 5.  As to this fact, plaintiff says that when he refused to go to the holding

23 cage that Mancill grabbed his arm, started forcing him to the cage, called other officers to help,

24 all of whom used force on him and removed his shoes.  This deposition testimony is included as

25 Ex. B to the MSJ, 60:4-13.  In portions of his deposition testimony not included as Ex. B to the

26 motion, plaintiff also testified that he stood in one spot, not cooperating, rather than resisting in

1   the manner described by defendants, plaintiff's dep. 70-74; however, plaintiff does not dispute

2   the central fact that he was resisting and was wholly uncooperative with defendants' efforts to

3   remove his shoes.

4          Plaintiff continued to be resistive; defendants Abella and Mancill pushed plaintiff

5   backwards while holding his arms and took plaintiff to the ground.  Defendant K. Smith assisted

6   by holding plaintiff by the shoulders.[11]  Plaintiff went down backwards, landing on his buttocks.

7   DUF # 49, Ex. H; Ex. J, ¶ 6; Ex. K¶ 5; Ex. M, ¶ 5.  At that point, defendant Mancill instructed

8   defendant Williams to take plaintiff's shoes.  Plaintiff relinquished the shoes without further

9   resistance.  DUF # 50, Ex. H; Ex. J, ¶ 6; Ex. K, ¶ 5.  Defendants Mancill and Abella assisted

10  plaintiff to a standing position and escorted him to the dayroom in front of the sergeant's office.

11  DUF # 52, Ex. H; Ex. J, ¶ 6.

12         Defendant Sgt. G. Smith arrived and instructed plaintiff to go into the holding cell

13  so that staff could summon a Medical Technical Assistant (MTA) to examine him for any

14  injuries.  Plaintiff admits that he refused.  DUF # 53, Ex. H; Ex. L; Ex. K, ¶¶ 6-7; Ex. B,

15  plaintiff's dep. 78:18-21.[12]  Defendant Sgt. Smith ordered defendants Mancill, Abella and

16  Williams to move plaintiff into the holding cell.  Defendants Mancill, Abella and Williams

17  pushed plaintiff towards the cell while defendant Sgt. Smith was pulling him by the front of his

18  jumpsuit.  The defendant officers succeeded in getting plaintiff into the holding cell by pulling

19  him, then pushing him from behind so that he would not try to back out of the cell.  Defendant

20  Mancill backed out of the cell and shut the cell door.  DUF # 54, Ex. H; Ex. J, ¶ 7; Ex. L.[13]

21  _____

22         [11] The court notes here that only in defendant K. Smith's declaration is there any
    reference to his participation in the take-down.

23         [12] While defendant G. Smith asserts that he told plaintiff to enter the holding cell three
24  times as plaintiff continued to refuse, the court notes that only defendant Smith makes the
    representation of having made his orders repeatedly to plaintiff to enter the holding cell.  Ex. L.

25         [13] There is some disparity among the supporting evidence for the manner of plaintiff's
26  being forced into the holding cage and by whom.  Defendant Mancill in his write-up for the
    crime incident report states that Abella had hold of plaintiff's right arm, Williams had hold of his

1          Defendant Sgt. Smith checked his staff for injuries and defendants Mancill and

2     Abella reported to the primary clinic for a medical evaluation.  DUF # 57, Ex. L.  MTA Romero,

3     already in the Building 10 Ad Seg unit, was immediately summoned.  MTA Romero conducted a

4     medical evaluation of plaintiff and documented the results on a CDC Form 7219, Report of

5     Injury or Unusual Occurrence.  DUF # 58, Ex. L.  Defendants cite inadequate support for the

6     following purported undisputed fact:  at no time did defendants Mancill, Abella, Williams or G.

7     Smith, use any force beyond what was necessary to gain plaintiff's compliance and to get him

8     into the holding cell without causing injury to him or to staff who were assisting in the escort.

9     DUF # 59, Ex. J, Abella Dec., ¶ 8.  In the only exhibit cited, defendant Abella, however, speaks

10    only for himself in asserting that he did not use force beyond what was necessary.  Though not

11    set forth as a separate undisputed fact, evidence submitted by both defendants and plaintiff

12    indicates that plaintiff sustained a scalp laceration for which plaintiff received eleven (11)

13    sutures.[14]  MSJ, Ex. A, pp. 116-117, 135-136 (Bates-stamped); Opp., plaintiff's Exh. I, pp. 43-

14

15    left arm and they pulled plaintiff by his arms while defendant G. Smith pulled plaintiff by his
      jumpsuit and defendant Mancill pushed plaintiff to the holding cell from the center of plaintiff's
16    back.  Ex. H.  Defendant Abella in his declaration agrees that Smith pulled plaintiff from the
      front of his jumpsuit, but that the other three all held plaintiff by the arms, also agreeing that
17    defendant Mancill was pushing, stating that Mancill was able to push plaintiff in far enough to
      shut the cell door.  Defendant G. Smith's report is in agreement with the others to the extent of
18    describing his having pulled plaintiff from the front of his jumpsuit but refers only to "both"
      escorting officers pulling on plaintiff's arms.  Ex. L.  Plaintiff in his deposition states that Sgt.
19    Smith gripped him by the front of plaintiff's jumpsuit and dragged him toward the holding cage,
      after which the others pulled and pushed him in.  Plaintiff's dep., pp. 78-79.

20

21          [14] Plaintiff asks the court to "accept" a videotaped interview of plaintiff following the
      incident of March 2, 2003.  He indicates that it was produced to him in response to a discovery
22    production request, that he had viewed and reviewed it, and that defendants are to provide the
      videotape to the court.  He does not state the basis for his belief that defendants are under any
23    obligation to produce this videotape on his behalf in opposition to their motion for summary
      judgment; more important, plaintiff does not set forth the relevance of the videotape.  On the face
24    of it, anything said on the tape would constitute hearsay, and if plaintiff believes that the tape
      would demonstrate the extent of the injury he sustained, such evidence would be redundant in
25    light of the fact that the court has copies of the photos of the laceration to his head, evidently
      taken immediately after the incident, submitted both by defendants and plaintiff.  Therefore,
26    plaintiff provides no foundation for the necessity of the tape in the adjudication of this motion
      and plaintiff's request with respect to it is disregarded.

1   44.[15]

2   *Disputed Facts*

3          While defendants assert that it is an undisputed fact that defendant Corr. Lt. Sandy

4   advised defendant Mancill to confiscate plaintiff's tennis shoes, maintaining they were

5   unauthorized, but did not authorize defendant Mancill to use *any*[16] means to obtain them, DUF #

6   40, Ex. I, ¶ 9, plaintiff in his deposition states that defendant Sandy instructed defendant Mancill

7   to remove plaintiff's tennis shoes and "to do whatever he had to do to get them." MSJ, Ex. B,

8   63:3-21. Plaintiff states that defendant Sandy was present at the time he was ordered to strip at

9   the library and did, yet his clothes and the shoes were returned to him at that point; plaintiff also,

10  however, somewhat confusingly, admits that defendant Sandy ordered him to remove the shoes

11  at the library, which plaintiff refused to do. He contends that the later order to remove the shoes

12  was a punitive measure meted out because of his disruptive behavior in the library. Plaintiff does

13  state that he explained to defendant Sandy that he had a chrono authorizing the shoes. Ex. B,

14  plaintiff's dep. 61-66. In his opposition, plaintiff asserts that he was handcuffed (undisputed),

15  while he was being escorted from the library, had a "medical excuse" to wear the soft shoes for

16  the duration of his stay (evidently meaning his sequestration in Ad Seg), and that he had been

17  wearing the tennis shoes for the past five months (again, evidently while in Ad Seg). Opposition

18  \\\\\

19  \\\\\

___

20

21        [15] Defendants set forth a number of undisputed facts, occurring after the incident at issue
   with these defendants, apparently in an effort to demonstrate plaintiff's propensity for disruptive
22  behavior. Plaintiff was issued three days after the incident involving the above-named
   defendants, on March 5, 2003, a CDC-115 RVR for resisting staff in an unrelated incident, which
23  ultimately required the use of force. DUF # 10, Ex. A, pp. 47-64. In addition, on March 6, 2003,
   March 16, 2003; April 18, 2003; April 20, 2003; and on April 25, 2003, plaintiff was issued
24  CDC 115 RVRs for respectively, disrespecting staff; being disrespectful and using profane
   language toward other inmates; assaulting staff and requiring the use of force; for urinating
25  outside his cell door; for willfully obstructing a peace officer in the performance of his duties.
   DUF Nos. 12-15, Ex. A, pp. 47- 50, 65-113.

26        [16] Defendants' emphasis.

1   (Opp.), p. 10.[17]  Plaintiff produces as his Ex. G, a copy of a CSP-Solano Form CDC-128-C, with

2   his name and inmate number, with the following box checked:

3           May wear soft shoes in all areas except where prohibited for safety
        and security reasons (i.e., visiting, certain work assignments).
4

5           The chrono is dated as signed by a podiatric consultant named D. Highsmith on

6   10/21/02, and also signed on 10/25/02, by the Chief Medical Officer.  As to duration of the

7   chrono, the box is checked next to the line stating "Length of Stay."  Opp., pp. 39-40, plaintiff's

8   Ex. G.  Although she was evidently not present, as the court notes (Ex. I, ¶ 7), defendants

9   maintain it as an undisputed fact, citing defendant Sandy' declaration only, that defendant

10  Mancill used appropriate methods to remove plaintiff's shoes and to gain plaintiff's compliance.

11  DUF # 51, Ex. I, ¶ 9.  Plaintiff disputes this representation, contending that he was subjected to

12  excessive force with regard to the removal of his shoes, but nevertheless admitting that he had no

13  injuries from the take-down for the shoes.  Plaintiff's dep. (not included in MSJ, Ex. B), 79:1-6.

14          Even after removal of the shoes, which was the stated purpose of the use of force,

15  plaintiff contends, the defendants used excessive force – force which was solely punitive and

16  intended to cause harm.  Opp, pp. 10, 35.  Defendants maintain that it is undisputed that

17  defendant Jackson was called to assist defendants Mancill, Abella, and Williams with escorting

18  plaintiff to the holding cell on March 2, 2003; however, he just observed the other officers, DUF

19  # 56, Ex. N, defendant Jackson's C-1 Supplement to Crime Incident/Report, ¶¶4-5.

20  Nevertheless, plaintiff maintains defendant Jackson was one of the defendants who did use

21  physical force; he claims that defendant Sandy, who no one contends was a part of the actual

22  placement of plaintiff in the cage that day, was the cause of the force that was used against him

23  and evidenced indifference to the "brutal behavior" of defendants Mancill, G. Smith, K. Smith,

24  Abella and Williams.  Opp., pp. 11, 28.  Defendants contend that it is undisputed that plaintiff

25

26          [17] The pagination references the automatic page numbering in the court's electronic
    docket.

1    flung himself forward and appeared to hit his head on the back of the holding cell, and that while

2    defendant Mancill was securing the cell door padlock in place, plaintiff said: "I got you now!  I

3    got you now!  I hit my head!  I'm bleedin[g]!  I got you now!"  DUF # 55, Ex. H, [p. 7]; Ex. J, ¶

4    7; Ex. L, [p. 3].   However, in his opposition, plaintiff argues that defendants' explanation of his

5    injury is "totally unreasonable," that seven men forcing one into a holding cage smaller than a

6    telephone booth with a metal stool and table inside indicates malicious and sadistic behavior and

7    intent.  Opp., pp. 35-37, plaintiff's Ex. F (copy of photographs of holding cell, interior and

8    exterior).  In his deposition testimony, plaintiff states the following (only some of which is

9    contained in the portion submitted in support of defendants' motion):

10              Now, the first use of force when they received the shoes - - when
                they took the shoes off my feet, at that time I didn't have any
11              apparent injuries, but now when they decided to use force a second
                time allegedly for the purpose to receive medical treatment, then
12              they - - that's when they dragged me, pulled me, pushed me and
                threw me into this metal holding cage that's about the size of a
13              telephone booth and inside of it has a metal stool and a metal table
                that takes up even more space than that, which is impossible for
14              somebody to just walk in it probably, you know without taking the
                time.  And they threw me into that and then I received my injury.
15              That's when my head was injured and that's what happened after
                that.
16

17   Plaintiff's dep., 79:4-17.

18              Plaintiff also asserts, somewhat dubiously, that he did not resist being taken to the

19   holding cage even though he admits that he flatly refused to go:

20              And I informed Sergeant Smith that I didn't want to go to the
                holding cage and once I informed Sergeant Smith I didn't want to
21              go to the holding cage, he became upset with my refusal to go to
                the holding cell and he grabbed me with force by my shirt, my
22              jumpsuit and gripped my jumpsuit is a fist grip and proceeded to
                drag me to the holding cage.  And when he did that, then that
23              caused the other officers  - - the same mentioned officers to again
                use abuse and excessive force for the purpose of getting to this
24              holding cage.

25   Plaintiff's dep., 78:18-25.

26   \\\\\

1        Q.  While they were pushing and dragging you into the holding

2   cage, you were not resistive at all - -

3        A.  No.

4        Q. - - is that correct?

5        A.  That's correct.

6   Id., 80:9-13.

7        Plaintiff further contends that he only yelled that he had hit his head and was

8   bleeding, but denies having shouted: "I got you now!  I got you now!  I hit my head!  I'm

9   bleedin[g]!  I got you now!"  Id., 81:20-24.

10       *Legal Standard for Eighth Amendment Excessive Force Claim*

11       "'After incarceration, only the 'unnecessary and wanton infliction of pain'...

12  constitutes cruel and unusual punishment.'"  Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct.

13  1078, 1084 (1986) [citations omitted].  "To be cruel and unusual punishment, conduct that does

14  not purport to punishment at all must involve more than ordinary lack of due care for the

15  prisoner's interests or safety."  Id.  "Where a prison security measure is undertaken ostensibly for

16  the protection of prison officials and the inmate population, force is deemed legitimate as long as

17  it is applied 'in a good faith effort to maintain or restore discipline [and not] maliciously and

18  sadistically for the very purpose of causing harm.'"  Jeffers v. Gomez, 267 F.3d 895, 910-911 (9th

19  Cir. 2001), quoting Whitley v. Albers, 475 U.S. at 320-21, 106 S. Ct. at 1085; (see also, as noted

20  earlier:  "whenever prison officials stand accused of using excessive physical force in violation of

21  the [Eighth Amendment], the core judicial inquiry is...whether force was applied in a good-faith

22  effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Hudson v.

23  McMillian, 503 U.S. at 6-7,112 S. Ct. at 999).

24       When determining whether the force was excessive, we look to the "extent of the

25  injury..., the need for application of force, the relationship between that need and the amount of

26  force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to

1  temper the severity of a forceful response.'" <u>Hudson v. McMillian</u>, <u>supra</u>, at 7, 112 S. Ct. at 999.

2                                      *Discussion*

3            As to defendants Sandy and Jackson, plaintiff does not adequately dispute

4   defendants' evidence that neither of these defendants were responsible for or had any physical

5   contact with plaintiff with respect to either attempting to place him or to actually placing him in

6   the holding cell during which he received a laceration to his head.  Plaintiff does not contend that

7   defendant Sandy was in the area at the time of the incident, but only that orders she gave resulted

8   in his injury.  Likewise as to defendant Jackson, plaintiff in no way counters the facts as set forth

9   in defendant Jackson's Crime Incident Report C-1 Supplement, wherein he states that he only

10  observed the incident, evidently standing by in case he was needed.  Nothing in the various

11  reports of, and affidavits concerning, the incident submitted by defendants supports plaintiff's

12  original allegation that defendant Jackson had any physical contact with plaintiff,

13  notwithstanding plaintiff's assertions in his opposition and in his deposition testimony that

14  defendant Jackson was involved in the use of force against him.  The vagueness of his assertions

15  are not enough to refute defendants' evidence that there was no such contact,[18] thus, plaintiff

16  raises no genuine issue of material fact as to this defendant and defendants motion for summary

17  judgment as to both defendants Sandy and Jackson should be granted.

18            With respect to defendant K. Smith, again plaintiff does not counter defendants'

19  evidence that he was engaged only in the original take-down when plaintiff's shoes were

20  removed, as to that incident although defendants acknowledge having used force, plaintiff

21  concedes that he refused to cooperate with the request to remove his tennis shoes and that he was

22  not physically injured by the actions defendants took to remove his shoes.  That plaintiff may

23

24        [18] "When Officer Mancill began to pull me and use force on me, then he saw another
officer walking by who I later learned was Officer Abella and he said he needed help.  And then

25  Officer Abella ran to where we were at and then they both began to grab me and pull me.  And
when that was going on then Officer K. Smith and Officer T. Williams and Officer A.R. Jackson

26  they all ran to that area.  And next thing you know everybody was grabbing on me and pulling on
me and trying to force me to this holding cage."  MSJ, Ex. B, plaintiff's dep. 72:17-73:1.

1   have been medically excepted from whatever prison rule there is forbidding the wearing of soft

2   shoes in Ad Seg cannot justify his refusal to surrender his shoes when ordered to do so.  It is

3   quite likely that when the chrono was considered the shoes would have been returned.  Or the

4   exception in the chrono itself may have been applied to keep them from him, notwithstanding

5   that he may have had them for the five previous months.  In any event, his verbal and (even if

6   limited) physical resistance and general uncooperativeness ended in a struggle which he does not

7   adequately refute was a result of his own obstinacy, nevertheless ending with little discomfort for

8   plaintiff by his own admission.  Defendants' motion for summary judgment as to defendants

9   Mancill, K. Smith, Abella and Williams as to the incident involved in taking plaintiff to the

10  ground to remove his shoes should be granted.  As to defendant K. Smith, plaintiff does not raise

11  a genuine issue with regard to him in that he does not adequately refute the evidence that

12  defendant K. Smith had any further involvement, so the motion as to defendant K. Smith should

13  be granted and judgment entered in his favor.

14        With respect to the "throwers," defendants G. Smith, Mancill, Abetta, and

15  Williams, no reasonable factfinder could find but that plaintiff disobeyed a lawful order to get

16  into the cage, and would not go there unless forceably placed within it.  Plaintiff does not allege

17  that once there, defendants beat his head against the cage, or otherwise did any affirmative act

18  once he was within the cage.  However, being cut while forceably placed in the cage does not per

19  se give rise to an Eighth Amendment violation.  Nor does the Eighth Amendment require that

20  plaintiff be treated in the gentlest fashion under the circumstances.  Force was being used in

21  order to thwart resistive conduct by plaintiff herein, and nothing plaintiff has related indicated

22  that the force was sadistic in its nature.  While it may have been more force than plaintiff would

23  have liked, i.e., pushing and dragging, this type of force was legitimately related to the object of

24  maintaining discipline when dealing with a prisoner who believed that the avenue to get what he

25  desired in prison was to be obstructionist.  Other than pushing or dragging, plaintiff does not

26  suggest what type of force wold have been sufficient to place him within the cage, given his

1   refusal to go there himself – and the court cannot conceive of what that would have been.  Nor do

2   prison officials have to be emotionless when forcefully requiring an action to be taken.  Only

3   force out of all proportion to that required by the circumstances, i.e. sadistic and malicious, is

4   actionable.  The court will not stand in hindsight judgment of every arm twist, every push, every

5   takedown when an active altercation is under way.  When there is a lack of evidence that

6   defendants meant to cause sadistic harm that eventually ensued, either actual or inferential,

7   liability is precluded.

8            Having found no constitutional violation, the court need not assess whether

9   qualified immunity is appropriate.

10                  *Defendant Obedoza*

11                      *Undisputed Facts*

12           It is undisputed that shortly after plaintiff received the cut to his head, he

13   was seen by medical staff and defendant Obedoza stitched the scalp laceration.  Plaintiff was

14   later seen in the medical clinic and complained about dizziness and nausea but denied having

15   vomited.  The MTA examined him, noting that his pupils were of equal size; his ears, nose and

16   throat were clear.  Plaintiff had full neck movement and could move his extremities.  The MTA

17   ducated plaintiff to see a physician the next day and told plaintiff to tell unit staff if any

18   symptoms became worse.  DUF # 60, MSJ, Ex. O, Medical Records, pp. 7, 18; Ex. B, 83:11-12.

19   Plaintiff was seen in Ad Seg for followup by defendant Obedoza; defendant Obedoza referred

20   plaintiff for suture removal on March 7, 2003.  DUF # 61, Ex. O, pp. 7, 18; Ex. B, 85:17-25.

21   Defendant Obedoza prescribed Darvocet for plaintiff's pain, giving him a dose of Darvocet and

22   prescribing it for three days.  DUF # 62, Ex. O, p. 4; Ex. B, 84:6-25.

23          *Legal Standard for Eighth Amendment Inadequate Medical Care Claim*

24           In order to state a § 1983 claim for violation of the Eighth Amendment based on

25   inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

26   deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct.

1   285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively

2   serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter,

3   501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir.

4   1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference."

5   Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

6           A serious medical need exists if the failure to treat a prisoner's condition could

7   result in further significant injury or the unnecessary and wanton infliction of pain.  Indications

8   that a prisoner has a serious need for medical treatment are the following:  the existence of an

9   injury that a reasonable doctor or patient would find important and worthy of comment or

10  treatment; the presence of a medical condition that significantly affects an individual's daily

11  activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900

12  F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01

13  (9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other

14  grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

15          In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court

16  defined a very strict standard which a plaintiff must meet in order to establish "deliberate

17  indifference."  Of course, negligence is insufficient.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.

18  However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

19  which is so obvious that it should be known) is insufficient.  Id. at 836-37, 114 S. Ct. at 1979.

20  Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

21  should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

22          It is nothing less than recklessness in the criminal sense—a subjective standard—

23  disregard of a risk of harm of which the actor is actually aware.  Id. at 838-842, 114 S. Ct. at

24  1979-1981.  "[T]he official must both be aware of facts from which the inference could be drawn

25  that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837,

26  114 S. Ct. at 1979.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk

26

1  of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at

2  847, 114 S. Ct. at 1984. "[I]t is enough that the official acted or failed to act despite his

3  knowledge of a substantial risk of serious harm." Id. at 842, 114 S. Ct. at 1981. If the risk was

4  obvious, the trier of fact may infer that a defendant knew of the risk. Id. at 840-42, 114 S. Ct. at

5  1981. However, obviousness per se will not impart knowledge as a matter of law.

6          Also significant to the analysis is the well established principle that mere

7  differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

8  Amendment violation. Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon,

9  662 F.2d 1337, 1344 (9th Cir. 1981).

10         Moreover, a physician need not fail to treat an inmate altogether in order to violate

11 that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.

12 1989). A failure to competently treat a serious medical condition, even if some treatment is

13 prescribed, may constitute deliberate indifference in a particular case. Id.

14         Additionally, mere delay in medical treatment without more is insufficient to state

15 a claim of deliberate medical indifference. Shapley v. Nevada Bd. of State Prison Com'rs, 766

16 F.2d 404, 408 (9th Cir. 1985). Although the delay in medical treatment must be harmful, there is

17 no requirement that the delay cause "substantial" harm. McGuckin, 974 F.2d at 1060, citing

18 Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-

19 1000. A finding that an inmate was seriously harmed by the defendant's action or inaction tends

20 to provide additional support for a claim of deliberate indifference; however, it does not end the

21 inquiry. McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992). In summary, "the more serious the

22 medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those

23 needs, the more likely it is that a plaintiff has established deliberate indifference on the part of

24 the defendant." McGuckin, 974 F.2d at 1061.

25         Superimposed on these Eighth Amendment standards is the fact that in cases

26 involving complex medical issues where plaintiff contests the type of treatment he received,

expert opinion will almost always be necessary to establish the necessary level of deliberate

indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus, although there

may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the

treatment he received equated with deliberate indifference thereby creating a material issue of

fact, summary judgment should be entered for defendants.  The dispositive question on this

summary judgment motion is ultimately not what was the most appropriate course of treatment

for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence,

criminally reckless.

### *Discussion*

Although defendants characterize plaintiff's claim as being that defendant

Obedoza violated his rights by not giving him enough Darvocet for the three days and for not

being overly sympathetic to him about the incident, plaintiff's claim is more accurately couched

as being that defendant Obedoza did not follow up to make sure that plaintiff received the three-

day Darvocet prescription, and, in fact, plaintiff's exhibit supports his allegation that he was

never provided the Darvocet Obedoza prescribed for the three-day period.  In plaintiff's Ex. I to

his opposition, plaintiff includes a second level appeal response with the following findings:

> Results of the inquiry revealed you were seen by Dr. Obedoza on
> March 2, 2003, for a scalp laceration that you stated occurred
> during an altercation.  You were prescribed Darvocet-N for pain
> for a total of 3 days.  You were given 1 dose of Darvocet at 1420
> hours on March 2, 2003; however, the order was never received at
> the Pharmacy.  Although you did not receive the remaining order
> of Darvocet, you were seen by medical staff for a follow-up in Ad
> Seg on March 3, 2003, and you did not complain about any pain,
> nor did you complain about not receiving anymore pain medication
> (Darvocet).  On March 11, 2003, you were seen for removal of
> your sutures and you had no further complaints.  On this same date
> of March 11, 2003, you filed this appeal.

In his deposition, plaintiff complains that defendant Obedoza should have made

sure that plaintiff got the Darvocet prescription; he contends that the defendant could have given

him the three-day dose outright.  MSJ, Ex. B, 84:6-18.  On the other hand, plaintiff admits that he

1   did not complain of not having received the Darvocet the day following the day when he received

2   his stitches when he was seen in Ad Seg by a medical staffperson.  MSJ, Ex. B, 90:10-13.

3          Plaintiff's allegation that defendant Obedoza intended to deliberately deprive him

4   of the medication of which he gave him one dose and for which he wrote a prescription is not

5   supported by the evidence.  Plaintiff's dep., 88:24-89:2.  It is undisputed that plaintiff received

6   the stitches to his head, on March 2, 2003, from defendant Obedoza on the day he received the

7   injury and that he received a dose of Darvocet at that time.  Plaintiff made no complaint about

8   not receiving pain medication to a medical technician the next day, and evidently made no

9   request concerning not having received the medication until long after the time that the

10  prescription would have run out.  Plaintiff's dep., 91:10-22.  Despite plaintiff's complaint that he

11  was subjected, by not having the pain medication, to unnecessary pain from his injury, at most,

12  defendant's failure to make sure that plaintiff's three-day follow-up pain medication prescription

13  was filled might constitute an act of negligence, conduct which does not rise to the requisite level

14  to constitute an Eighth Amendment violation.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.

15  Defendants' motion for summary judgment as to defendant Obedoza should be granted.

16         Accordingly, IT IS HEREBY RECOMMENDED that defendants' motion for

17  summary judgment, filed on March 20, 2006, be granted to all defendants except defendant

18  Young; the only issue remaining is whether Young set up plaintiff for a "gassing" attack.

19         These findings and recommendations are submitted to the United States District

20  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

21  days after being served with these findings and recommendations, any party may file written

22  objections with the court and serve a copy on all parties.  Such a document should be captioned

23  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

24  shall be served and filed within ten days after service of the objections.  The parties are advised

25  \\\\\

26  \\\\\

1   that failure to file objections within the specified time may waive the right to appeal the District

2   Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3   DATED: 2/22/07

4                                                              /s/ Gregory G. Hollows

5                                                              _____
                                                             GREGORY G. HOLLOWS
                                                             UNITED STATES MAGISTRATE JUDGE

6   GGH:009
    dani0400.msj2

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26